### ROBERT T. MULLIGAN *v.* STATE OF MARYLAND

[No. 800, September Term, 1972.]

*Decided August 10, 1973.*

The cause was argued before GILBERT, MENCHINE and SCANLAN, JJ.

*Arthur Dale Leach* for appellant.

*Gilbert Rosenthal, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City, Diane Schulte* and *Sandra O'Connor, Assistant State's Attorneys for Baltimore City,* on the brief, for appellee.

GILBERT, J., delivered the opinion of the Court.

Robert T. Mulligan, appellant, makes his third appearance in this Court as a result of his being convicted thrice by a jury in the Criminal Court of Baltimore for the second degree murder of his child, Mary Lynn Mulligan, age eight months. We reversed the appellant's first· conviction, *Mulligan v. State,* 6 Md. App. 600, 252 A. 2d 476 (1969), because of a violation of appellant's rights guaranteed to him by *Miranda v. Arizona,* 384 U. S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966). The second case of the appellant to reach this Court, *Mulligan v. State,* 10 Md. App. 429, 271 A. 2d 385

(1970), was reversed "because a statement obtained from Mulligan by custodial interrogation reached the jury without a preliminary determination by the trial court that it was voluntary."

As a result of the second *Mulligan* reversal, the appellant was retried. His current conviction has led to a legalistic broadside being directed toward the trial court's rulings both at a suppression hearing, pursuant to Rule 725, and during the course of the trial.

No useful purpose would be gained by another recitation of the facts surrounding the death of the infant, Mary Lynn,[1] although we shall state such of them as are necessary to our discussion.

The appellant moved to suppress evidence of an oral confession allegedly made by him to Lt. Charles W. Goodrich of the Baltimore City Police Department. At the outset of the hearing on the motion, the State moved for "appropriate relief." The Assistant State's Attorney said:

> "The State is requesting in its motion that Mr. Leach [defense counsel] refrain from asking any questions of this witness either in this hearing or on the case in chief regarding any disciplinary proceedings that may have taken place through the Baltimore City Police Department with regard to Mr. Goodrich."

The court reserved its ruling on the motion until the hearing, conducted out of the presence of the jury, was concluded. Appellant's counsel, through a maze of questions, endeavored to attack the credibility of Goodrich. The lieutenant was painfully interrogated relative to the circumstances surrounding the arrest and booking of the appellant. Goodrich said that he, the appellant, and other officers arrived approximately at 10:55 a.m. at the Southwestern Police Station. In response to the question, "What did you charge Mr. Mulligan with?" Goodrich

---

1. A full narrative of the facts in this case may be found in Mulligan v. State, 6 Md. App. 600, 252 A. 2d 476 (1969).

responded, "Mr. Mulligan was booked for investigation of homicide." He further said, "I instructed the desk sergeant to book him for investigation of homicide." Mulligan was then placed in the cell and the lieutenant explained the reason for doing so as:

> "At that particular time, I didn't have sufficient information in my opinion to really conduct an interrogation of Mr. Mulligan, and I wanted to accumulate more information, so that when I did, in fact, interrogate Mr. Mulligan, I would be able to do a better job than I could at that time. I had very little information to really conduct a good interrogation, and I thought it was incumbent upon me to obtain more information, so that my interrogation would bear a little better fruit than it would at that time."

The lieutenant insisted that the charge was "investigation of homicide." The typewritten arrest register offered into evidence notes the charge against Mulligan to be that of: "unlawfully, wilfully and maliciously did strike and beat one Mary L. Mulligan, a female infant age eight months and thereby causing the death of said, Mary L. Mulligan, at St. Agnes Hospital at 11:12 a.m. on May 30, 1966 in Baltimore City, State of Maryland." The copy of the arrest register dated June 3, 1966, with the time of arrest stated as 10:30 a.m., is unsigned, although there is a place for signature. Superimposed upon the report, however, are notes admittedly written in Goodrich's handwriting.

Further inquiry was made concerning an "offense report" and a "supplementary offense report" consisting of three leaves of paper with typing on the obverse side of all three leaves and on the reverse side of one. The "offense report" and "supplementary offense report" appear to have been reproduced. They were signed by the officer in charge of the Southwestern District at the time of the offense, but the record discloses the signatures to be perfunctory. The name of the investigating officer is typed "Robert Schleicher." There also appears a typist's initials of "aan." The reports do

not bear the signature of Goodrich or any other officers who actually conducted the investigation into the death of Mary Lynn Mulligan, unless the typed name "Robert Schleicher" is deemed to be a "signature."

The vigorous cross-examination of Lt. Goodrich was based on the knowledge possessed by appellant's counsel that Goodrich had been found guilty by a police departmental trial board of seven "specifications of violation of Rule 1, Conduct, § 17, Police Department of Baltimore City *Rules and Regulations and Manual of Procedure* (1959)." [2] Each of the specifications alleged that the lieutenant had "filed or caused to be filed a false report in substitution of the original report." Two other charges, adopting *in toto* the specifications of the first charge, were also lodged against Lt. Goodrich. One charged a violation of Rule 1, § 19 [3] of the *Rules and Regulations and Manual of Procedure*, and the other a violation of Rule 6, § 5 thereof.[4] Goodrich was

---

2. Rule 1 provides in pertinent part:

"Rule 1 — CONDUCT

Any breach of the peace, neglect of duty, misconduct or any conduct on the part of any member of the department, either within or without the City of Baltimore, which tends to undermine the good order, efficiency, or discipline of the department, or which reflects discredit upon the department or any member thereof, or which is prejudicial to the efficiency and discipline of the department, even though these offenses may not be specifically enumerated or laid down, shall be considered conduct unbecoming a member of the Police Department of Baltimore City, and subject to disciplinary action by the Police Commissioner.

\* \* \*

Section 17. No member of the department shall make any false statement or intentionally misrepresent facts under any circumstances."

3. That section provides:

"Section 19. Members of the department shall be held strictly responsible for the proper performance of their duties."

4. Those portions of Rule 6 applicable here provide:

"Rule 6 — REPORTS AND COMMUNICATIONS

In the transaction of departmental business, all reports and communications shall be prepared and handled in accordance with the procedure of the department.

\* \* \*

Section 5. Such reports as may be required to properly ad-

likewise found guilty by the trial board of those two charges. The action of the board was confirmed by Commissioner Pomerleau on February 15, 1972. The offenses were all alleged to have occurred during the period March through June, 1971. The appellant offered "Personnel Order #72-91," which was the actual findings of the trial board, as well as the action taken by Commissioner Pomerleau, for identification purposes, but the trial judge refused to allow any questions of the witness concerning either the charges or the findings by the police department tribunal. At the conclusion of the hearing on the motion to suppress, the trial judge, as we have noted, ruled the confession admissible. The State's motion for appropriate relief, *i.e.*, to preclude Goodrich's being questioned before the jury, as to the findings of the police trial board, was granted.

As a general rule, the degree to which cross-examination is permitted is to a large extent vested in the discretion of the trial court. *Williams v. State*, 15 Md. App. 320, 290 A. 2d 542 (1972); *Jenkins v. State*, 14 Md. App. 1, 285 A. 2d 667 (1971); *Long v. State*, 7 Md. App. 256, 254 A. 2d 707 (1969); *Duncan v. State*, 5 Md. App. 440, 248 A. 2d 176 (1968). Under the circumstances of the instant case, for the reasons hereinafter stated, we think the judge abused that discretion.

3A Wigmore, *Evidence*, § 983 (Chadbourn rev. 1970) quotes from the case of *Territory v. Chavez*, 8 N. M. 528, 531, 45 P. 1107-1108 (1896). There the court, in speaking of the cross-examination of witnesses, said:

> " ... The truth is the thing to be sought. Assaults upon a witness by cross-examination into collateral matters cannot be allowed to gratify the caprice or the displeasure of those against whom he testifies; and intrusions into private affairs, which are calculated merely to wound the feelings, humiliate, or embarrass the witness, will not be permitted. ...

---

minister the affairs of the department, or to furnish information, shall be submitted in accordance with departmental procedure."

> But a clear distinction is to be taken between those matters called for on cross-examination which merely excite prejudice against the witness, or tend to humiliate him or wound his feelings, and those matters, on the other hand; which are calculated, in an important and material respect, to influence the credit to be given to his testimony. As to the latter class, the witness cannot be shielded from disclosing his own character on cross-examination, and for the purpose he may be interrogated upon specific acts and transactions of his past life; and if they are not too remote in time, and clearly relate to the credit of the witness; in an important and material respect, it would be error to exclude them. How far justice may require such examinations to go, how much time should be spent upon them, what should be excluded for remoteness of time, and what for being trivial or unimportant, must depend in some measure upon the circumstance of each case; and these are questions addressed primarily to the discretion of the trial Court; but the discretion should be liberally exercised."

The issue at the suppression hearing boiled down to one of choosing between the credibility of Lt. Goodrich on the one hand, and that of the appellant, bolstered to some extent by his wife, on the other hand. It was, in essence, a battle of affidavits.

We think the testimony concerning Goodrich's having been found guilty of falsifying official reports of the Baltimore City Police Department was relevant to the issue of his credibility. It may be that the trial judge, had he considered the evidence demonstrating Goodrich's falsification of official police reports, would have, nevertheless, believed the lieutenant's testimony and not that of the appellant, but we shall not speculate thereon. Nor can we say that if the jury had heard testimony of the lieutenant's falsification of police reports, it would have believed him. The jury should have been allowed to weigh the lieutenant's testimony on the scale of *Proverbs* 14:5, "A

faithful witness will not lie: but a deceitful witness uttereth a lie."

Professor Charles T. McCormick, in his *Handbook of the Law of Evidence*, 1954 Ed., at § 42, after discussing "[t]he English common law tradition of 'cross-examination to credit,' " states:

> "In this country, the danger of victimizing witnesses and of undue prejudice to the parties, has led most of our courts to recognize that this kind [the English common law tradition] of cross-examination, though permitted, is subject to a discretionary control by the trial judge. Some of the factors, in addition to those of undue humiliation and unfair prejudice, ... which may, it seems, sway discretion, are (1) whether the testimony of the witness under attack is crucial or unimportant, (2) whether the misconduct inquired into is relevant to truthfulness, such as false swearing, fraud and swindling, or bears only on 'general bad character' such as acts of violence or unchastity, (3) the nearness or remoteness of the misconduct to the time of trial, and (4) whether the matter inquired into is such as to lead to time-consuming and distracting explanations on cross-examination or re-examination. (Footnotes omitted).

\* \* \*

> The final curb on character-impeachment by proof of misconduct not the subject of convictions is the important and accepted rule that it is limited to cross-examination. Thus, if the witness denies the alleged misconduct, the examiner must 'take his answer,' not in the sense that he may not further cross-examine to extort an admission, but in the sense that he may not call other witnesses to prove the discrediting acts." (Footnotes omitted).

This Court noted in *DeLilly v. State*, 11 Md. App. 676, 276 A. 2d 417 (1971), at 681:

"We are, of course, mindful of the general rule so frequently cited that the allowance or disallowance of questions on cross-examination is normally left to the sound discretion of the trial judge. But where the limitations imposed by the court upon cross-examination are such as plainly inhibit the ability of the accused to obtain a fair trial, the general rule is manifestly inapplicable. *Shupe v. State*, 238 Md. 307. The real object of cross-examination is 'to elicit all the facts of any observation or transaction which has not been fully explained.' *Williams v. Graff*, 194 Md. 516, and cases cited at p. 523. *That a witness may be cross-examined on such matters and facts as are likely to affect his credibility, test his memory or knowledge or the like, is a fundamental concept in our system of jurisprudence. Kantor v. Ash,* 215 Md. 285; *Bryant v. State,* 4 Md. App. 572. *And cross-examination to impeach, diminish, or impair the credit of a witness is not confined to matters brought out on direct examination; it may include collateral matters not embraced in the direct examination to test credibility and veracity, it being proper to allow any question which reasonably tends to explain, contradict, or discredit any testimony given by the witness in chief, or which tends to test his accuracy, memory, veracity, character, or credibility.* 3 Wharton's Criminal Evidence, Sections 870, 871; 58 Am. Jur. *Witnesses* Section 625. Of course, the right to cross-examine effectively necessarily includes the right to place the testimony of a witness in its proper setting to fairly enable the jury to judge its credibility. *Smith v. Illinois*, 390 U. S. 129; *Alford v. United States,* 282 U. S. 687; *Plank v. Summers,* 205 Md. 598." (Emphasis supplied).

2 *Wharton's Criminal Evidence* (13th ed. 1972), at § 440, states:

"A witness may be cross-examined as to his past

life, bad character, occupation, associations, companions, habits, or any conduct which tends to discredit his testimony. The extent to which such cross-examination will be permitted is within the discretion of the trial judge." (Footnotes omitted).

A statement to the same effect is found in 1 *Underhill's Criminal Evidence* (6th ed. 1973), at § 230.

In the instant case, the appellant made known to the trial judge that he, the appellant, was in possession of a copy of "Personnel Order 72-91" in which the charges against the lieutenant, the findings of the trial board and the commissioner's disposition were contained.

We think that the inquiry sought to be raised by the appellant was "crucial" and that the alleged "misconduct" was "relevant to truthfulness." Failure to allow the cross-examination of Goodrich relative to the false arrest registers, upon which he was adjudged "guilty" by the police trial board, constitutes reversible error. We do not suggest that inquiry concerning alleged misconduct by a witness may be conducted as a baseless fishing expedition, but rather that counsel should satisfy the trial judge preliminarily that there is a basis in fact for conducting the inquiry. Inquiry into the misconduct of a witness, however, should be limited to indicating the witness's lack of veracity.[5]

Having reversed the judgment, we would ordinarily cease our discussion, but we deem it advisable for the guidance of the trial court to comment upon the standard of proof required of the State at a suppression hearing, in order for a confession to be admitted into evidence. When the Supreme

---

5. Professor McCormick points out in § 42, n. 5, that:

"Some courts limit the inquiry to misconduct indicating lack of veracity. State v. Schutte, 97 Conn. 462, 117 A. 508, syl. 8 (1922) (living in adultery properly excluded); Nelson v. State, 99 Fla. 1032, 128 So. 1, syl. 2, 3 (1930) (use of opium, at other than relevant times, properly excluded); State v. Knox, 98 S. C. 114, 82 S. E. 278, syl. 2 (1914) (previous cutting scrapes should have been excluded); 70 C. J. 869, § 1088."

Court decided *Jackson v. Denno,* 378 U. S. 368, 84 S. Ct. 1774, 12 L.Ed.2d 908 (1964), it said, at 376:

"It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession, *Rogers v. Richmond,* 365 U. S. 534, and even though there is ample evidence aside from the confession to support the conviction. *Malinski v. New York,* 324 U. S. 401; *Stroble v. California,* 343 U. S. 181; *Payne v. Arkansas,* 356 U. S. 560. Equally clear is the defendant's constitutional right at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession. *Rogers v. Richmond, supra.*"

This Court, in *Barnhart v. State,* 5 Md. App. 222, 226, 246 A. 2d 280, 283 (1968), said:

"A defendant's constitutional rights are violated when his challenged confession is introduced without the preliminary decision by the trial judge of its voluntariness after an adequate hearing."

Years before *Jackson v. Denno, supra,* the Court of Appeals, in *Smith v. State,* 189 Md. 596, 603-604, 56 A. 2d 818, 821-822 (1948), stated the rule to be:

"Before a confession can be admitted in evidence, the State must show, to the satisfaction of the court, that it was the free and voluntary act of an accused; that no force or coercion was exercised by the officers obtaining the confession, to cause the accused to confess; that no hope or promise was held out to an accused for the purpose of inducing him to confess. *If, after a consideration of both the evidence of the State and the evidence offered by an accused* (if any be offered by him) regarding the

matter, the court is of the opinion that the evidence shows, *prima facie,* that the confession was freely and voluntarily made, it should be admitted in evidence; and, if not, it should be rejected." (Emphasis supplied).

In the second *Mulligan* case, 10 Md. App. 429, 271 A. 2d 385 (1970), we said, at 432:

"The trial judge's conclusion that the confession was voluntary must appear from the record with unmistakable clarity."

Mr. Justice White, the author of the Court's opinion in *Jackson v. Denno, supra,* said for the majority [6] in *Lego v. Twomey,* 404 U. S. 477, 92 S. Ct. 619, 30 L.Ed.2d 618 (1972), at 478-479:

"While our decision [in *Jackson v. Denno, supra*] made plain that only voluntary confessions may be admitted at the trial of guilt or innocence, we did not then announce, or even suggest, that the factfinder at a coercion hearing need judge voluntariness with reference to an especially severe standard of proof. Nevertheless, since *Jackson,* state and federal courts have addressed themselves to the issue with a considerable variety of opinions."

The Court in n. 1 to *Lego, supra,* observed that:

" ... Many [of the States] have sanctioned a standard of proof less strict than beyond a reasonable doubt, including proof of voluntariness by a preponderance of the evidence or to the satisfaction of the court or proof of voluntariness in fact. ...[7]

\* \* \*

---

**6.** The Court split 4 to 3. Justice White was joined by the Chief Justice and Stewart and Blackman, JJ.; Justice Brennan dissented. He was joined by Douglas and Marshall, JJ.; Powell and Renquist, JJ., took no part in the consideration or decision of the case.

**7.** Barnhart v. State, *supra,* is cited in support of the statement.

Other States, using state law or not specifying a basis, require proof beyond a reasonable doubt...."

Justice White announced that the standard of proof required to determine the voluntariness of a confession is at least to be measured by a preponderance of the evidence. He said, at 489:

"To reiterate what we said in *Jackson*: when a confession challenged as involuntary is sought to be used against a criminal defendant at his trial, he is entitled to a reliable and clear-cut determination that the confession was in fact voluntarily rendered. Thus, the prosecution must prove at least by a preponderance of the evidence that the confession was voluntary. Of course, the States are free, pursuant to their own law, to adopt a higher standard. They may indeed differ as to the appropriate resolution of the values they find at stake." (Footnote omitted).

"Preponderance" [of evidence] is defined in Black's Law Dictionary 1344 (rev. 4th ed. 1968) to mean the "[g]reater weight of evidence, or evidence which is more credible and convincing to the mind."

In *Smith v. State, supra,* and other Maryland decisions,[8] the term *prima facie* is used. That type of evidence has been defined to mean, " ... good and sufficient on its face; such evidence as, in the judgment of the law, is sufficient to establish a given fact, or the group or chain of facts constituting the party's claim or defense, and which if not

---

8. State v. Hutchinson, 260 Md. 227, 271 A. 2d 641 (1970); Smith v. State, 237 Md. 573, 207 A. 2d 493 (1965); Ralph v. State, 226 Md. 480, 174 A. 2d 163 (1961); Presley v. State, 224 Md. 550, 168 A. 2d 510 (1961); Hall v. State, 223 Md. 158, 162 A. 2d 751 (1960); Linkins v. State, 202 Md. 212, 96 A. 2d 246 (1953); Smith v. State, 189 Md. 596, 56 A. 2d 818 (1948); Mulligan v. State, 10 Md. App. 429, 271 A. 2d 385 (1970); Murphy v. State, 8 Md. App. 430, 260 A. 2d 357 (1970); Cleveland v. State, 8 Md. App. 204, 259 A. 2d 73 (1969); McCarson v. State, 8 Md. App. 20, 257 A. 2d 471 (1969); Fowler v. State, 6 Md. App. 651, 253 A. 2d 409 (1969); Dennis v. Warden, 6 Md. App. 295, 251 A. 2d 909 (1969); Barnhart v. State, 5 Md. App. 222, 246 A. 2d 280 (1968); Boone v. State, 2 Md. App. 80, 233 A. 2d 476 (1967); Harris v. State, 1 Md. App. 318, 229 A. 2d 604 (1967); Cooper v. State, 1 Md. App. 190, 228 A. 2d 840 (1967).

rebutted or contradicted, will remain sufficient." Black's Law Dictionary, *supra*, at 1353-1354.

A perusal of *Smith v. State, supra,* and the other Maryland decisions to which we have referred in n. 8, *supra,* leads us to the inescapable conclusion that while Maryland has articulated that the evidence must be *prima facie*, it has, nevertheless, continuously been applying the preponderance of the evidence standard that a confession be freely and voluntarily made before it is admissible.

Only the testimony of Lt. Goodrich was produced by the State at the suppression hearing. The lieutenant testified that the appellant had made a statement to his, the appellant's wife, in the presence of Goodrich and other police officers, that the appellant had beaten the child. According to the lieutenant the statement was a "blurt" and was not the product of a custodial interrogation. The appellant testified that he was coerced by the actions of the police into making the statement. The appellant said that Lt. Goodrich threatened to jail the appellant's pregnant wife if appellant did not admit that he, appellant, had beaten the infant. Appellant avers that he thought the threatened action was about to occur when he was led into a room at the police station and found his wife seated there. Confronted with what he thought was the imminent arrest of his wife, he then, at the lieutenant's prodding, told his wife that he had beaten the child. Appellant also testified that he further stated that what he just said really wasn't so, but that he was forced to say it. On cross-examination, the day after the direct testimony of appellant at the hearing, he acknowledged that he may have been mistaken as to the time of his telling his wife that he was coerced into making the inculpatory admission. He said that he may not have remarked on his being forced to make the statement until some later time. Mrs. Mulligan said that when her husband was led into the room where she had been taken by the police, he was in a state of shock, dazed and red-eyed. She stated that she heard her husband make the statement that he had beaten the child, but she did not hear him say anything else at that time.

At the conclusion of the hearing, the trial judge observed:

"From an appraisal of all the evidence in this case, the evidence submitted by the State and also that produced by the Defense in this case on this issue, the Court is satisfied that the evidence is sufficient to show, *prima facie*, that the statement was not the product of police interrogation and was thus without the ambit of *Miranda*, even though the defendant was then in custody, and that the statement made by him was blurted out, and it was voluntary.

The Court is satisfied that the statement attributed to the defendant was freely and voluntarily made, and, therefore the motion is denied."

We think it apparent that the trial court applied the preponderance of the evidence test, irrespective of the name by which it was called.

Trial judges should not only apply the preponderance of evidence test to confessions, as has been required in this State for some time, *Smith v. State, supra,* and now nationally by *Lego v. Twomey, supra,* but they should, in order to avoid confusion, shun the use of the words *prima facie* in connection with the degree of proof required of the State to render a confession admissible.

*Judgment reversed and case remanded for a new trial.*
*Costs to be paid by the Mayor and City Council of Baltimore.*